# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ROBERT LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:17CV987 |
| | ) | |
| HOKE COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Robert Lewis, a *pro se* prisoner, filed the instant action against several defendants pursuant to 42 U.S.C. § 1983 for alleged denial of adequate treatment for serious medical needs and unlawful conditions of confinement while Plaintiff was a pre-trial detainee at the Hoke County Detention Center ("HCDC") between October 19, 2014 and February 8, 2017. (*See generally* Compl., Docket Entry 2; Am. Compl., Docket Enry 10.) Defendants Hoke County, Sheriff Hubert Peterkin ("Sheriff Peterkin"), Nachia Revels[1] ("Major Revels"), Southern Health Partners ("SHP"), Summit Food Services, LLC[2] ("Summit"), and Kevin

---

[1] Defendant Nachia Revels is referenced in Plaintiff's Complaint as "Nekia Revels" or "Major Revels." (*See* Compl., Docket Entry 2.)

[2] Plaintiff's original Complaint names "ABL Food Service" as a defendant in this action. (*See* Compl., Docket Entry 2.) ABL Management, Inc. ("ABL Food Service") previously provided food services to HCDC but is no longer actively engaged in business activities. (*See* Angela Anderson Declaration ¶¶ 5, 7, Docket Entry 37-1.) ABL Food Service's corrections facility accounts have been transferred to Summit. (*Id.* ¶ 8.) Summit currently provides food services to HCDC. (*Id.* ¶ 4.)

Case 1:17-cv-00987-WO-JLW   Document 101   Filed 09/01/20   Page 1 of 29

Edge[3] have all moved for summary judgment. (*See* Docket Entries 66, 69, 74, 76.) Plaintiff has not responded to the motions for summary judgment. For the reasons stated herein, the undersigned recommends that Defendants' motions for summary judgment be granted, and supplemental jurisdiction be declined as to Plaintiff's state law claim against Defendant Edge.

## I. BACKGROUND

Plaintiff's claims against Defendants arise from several incidents occurring between October 2014 and February 2017 at HCDC. (*See generally* Compl., Docket Entry 2.) In his Complaint, Plaintiff first asserts that Defendants denied him treatment for his diabetes upon his initial booking at HCDC on October 19, 2014 and continued to withhold treatment until October 22, 2014. (*Id.* at 15-17.)[4] Plaintiff alleges that the he inquired about seeing a nurse to check his blood sugar levels, get his diabetic medication, and be placed on a diabetic diet, but prison officials told him that HCDC policy allows medical staff up to 14 days to do an initial health screening on new admissions. (*Id.* at 15.) During the four-day delay in seeing the nurse, Plaintiff states that he was dehydrated and suffered from headaches, blurred vision, extreme thirst, and dizziness. (*Id.* at 16.) Furthermore, he feared that he would go into a diabetic shock because he was experiencing rapid breathing and a rapid heartrate. (*Id.*)

Thus, on October 21, 2014, Plaintiff wrote a grievance regarding his denial of treatment, but he allegedly never received a response. (*Id.*) Plaintiff was then seen by licensed practical nurse ("LPN") Sabrina Dial on October 22, 2014 in which she informed him that he

---

[3] Defendant Kevin Edge is referenced in Plaintiff's Complaint as "Kevin" or "Kevin ABL Food Service Manager." (*See* Compl., Docket Entry 2.)

[4] All citations in this recommendation to documents filed with the Court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

would be given two 1000mg tablets of metformin daily, placed on a medical diet, and allowed to check his blood sugars before breakfast and dinner meals. (*Id.* at 17.)

Plaintiff contends that on the next day he was still being fed "the same exact diet as non-diabetics," which is what he received when he was being deprived his medication. (*Id.*) This led to Plaintiff's additional claims against Defendants. Plaintiff asserts that Defendants failed to put him on a medical diet that was safe to manage his diabetes. (*Id.* at 17-18.) More specifically, Plaintiff states that his meals consisted of pasta, white bread, sweets, and processed meats. (*Id.* at 17.) Plaintiff states that in late 2014, he discussed his concerns with Nurse Jessica regarding the harmful food being served to diabetics. (*Id.* at 18.) Nurse Jessica agreed that it was harmful and informed Plaintiff that she spoke with Major Revels and ABL Food Service Manager Berniece regarding his unsatisfactory food diet. (*Id.*) However, no changes were made. (*Id.*)

In addition to an improper diet, Plaintiff alleges that there was improper care in handling of the meals that led to unsafe conditions. (*Id.* at 18-19.) He states that the meals were served cold daily, meals were undercooked, insects were found in meals, food trays were stacked uncovered, and food trays were moldy and had leftover food pieces on them. (*Id.* at 19.) Plaintiff then submitted grievances in December 2014 and in April 2015 regarding the unsafe food conditions and his unhealthy medical diet. (*Id.* at 19-20.) Both were ignored by Major Revels. (*Id.*) Then, on September 2, 2015, Plaintiff, along with eight other inmates, submitted grievances regarding the unsafe food conditions. (*Id.* at 20.)

In response to Plaintiff's September 2015 grievance, Major Revels said that she had "already met with the kitchen [staff]." (*Id.* at 20, 33.) Plaintiff claims that as a result of his

grievance, ABL Food Service demoted and replaced Manager Berniece in October 2015. (*Id.* at 20.) Plaintiff admits that after October 2015, the food trays were clean, meals were thoroughly cooked, and wheat bread was purchased for diabetics. (*Id.* at 20-21.) However, Plaintiff alleges that the new manager still did not correct the problems with cold food temperatures and Plaintiff's medical diet. (*Id.* at 21.) Plaintiff states that it was customary for cooks to add sugars to meals. (*Id.*) Plaintiff further states that consuming food with such high levels of sugar would elevate his blood sugar to harmful levels. (*Id.*)

Plaintiff states that he continued to talk with Nurse Dixon regarding his food diet concerns. (*Id.* at 21-22.) In March 2016, Nurse Dixon spoke with Major Revels, who informed her that there was nothing medical staff could do about Plaintiff's diet because ABL Food Service had its own dietitian that approved its menu. (*Id.* at 22.) Furthermore, Plaintiff alleges that ABL Food Service Director Defendant Edge informed Nurse Dixon that he could not give Plaintiff a better meal choice. (*Id.*) Additionally, Plaintiff requested an "information form" and also requested that Major Revels speak with him regarding his diet, but Major Revels never responded to either request. (*Id.* at 22-23.)

However, on April 5, 2016, Plaintiff's medical diet changed drastically. (*Id.* at 23.) His meals now consisted of small portions of peanut better, vegetables, wheat bread, apple sauce, milk, tortilla chips, and fruit. (*Id.*) Plaintiff was given the same "peanut butter and vegetable diet" for eleven months. (*Id.*) When Plaintiff inquired about this change, an unidentified jailer told him that it was because the kitchen manager was tired of him complaining. (*Id.* at 23-24.) Plaintiff asserts that LPN Michelle Sanders changed his medical diet despite not being qualified to exercise judgment regarding his medical needs. (*Id.* at 24.) Plaintiff then wrote his last two

4

grievances on May 16, 2016 addressing the harmful consequences of his new "unhealthy medical diet" and gave them to Corporal Rivera, but again there was no response. (*Id.* at 24-25.) Plaintiff states that during this time, about ten (10) pictures were taken of his food to demonstrate the inadequacy of his meals. (*Id.* at 25.)

As a result of Defendants' actions, Plaintiff alleges that he was unable to control his blood sugar, experienced swelling and numbness in his hands and feet, and ultimately developed nerve damage from the "hazardous diabetic diet and inadequate food." (*Id.* at 26.) Furthermore, he claims that the cold meals caused nausea, vomiting, and diarrhea. (*Id.* at 22.) Plaintiff alleges that he lost about 20 to 30 pounds because of inadequate nutrition. (*Id.* at 26.) Additionally, he claims that he suffered from abdominal pain due to hunger, fatigue, and constipation. (*Id.*)

## II. DISCUSSION

At the outset, the Court first notes that because Plaintiff failed to file a response to Defendants' summary judgment motions within the time required by this Court's Local Rules, "the motion will be considered and decided as an uncontested motion, and ordinarily will be granted without further notice." M.D.N.C. R. 7.3(k); *see also Kinetic Concepts, Inc. v. ConvaTec Inc.,* No. 1:08CV918, 2010 WL 1667285, at *6-8 (M.D.N.C. Apr. 23, 2010) (unpublished) (analyzing this Court's Local Rules 7.3(f), 7.2(a), and 7.3(k) and discussing authority supporting proposition that failure to respond to argument amounts to concession). Alternatively, Defendants' motions should be granted on the merits.

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Zahodnick*

5

*v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting).

When making the summary judgment determination, the Court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997). However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996); *see also Anderson*, 477 U.S. at 248-49.

In support of their motions, Defendants Edge, SHP, Summit, Hoke County, Sheriff Peterkin, and Major Revels have submitted affidavits and declarations addressing Plaintiff's allegations. (*See* Nachia Revels Affidavit, Docket Entry 67-1; Hubert A. Peterkin Affidavit,

Docket Entry 67-2; Lorna Huffman, RN Affidavit, Docket Entry 70; Michelle Sanders, LPN Affidavit, Docket Entry 71; Gregory Holley Declaration, Docket Entry 75-2; Justin Barthel Declaration, Docket Entry 75-3; Kevin Edge Declaration, Docket Entry 75-4; Angela Anderson Declaration, Docket Entry 75-8.) Additionally, Defendants submitted Plaintiff's deposition transcript (Deposition of Robert Dwayne Lewis Part I ("Lewis Part I Dep."), Docket Entry 67-3; Deposition of Robert Dwayne Lewis Part II ("Lewis Part II Dep."), Docket Entry 67-4; Lewis Excerpt Deposition ("Lewis Excerpt Dep."), Docket Entry 72-2), Plaintiff's Medical Records (Docket Entry 70-1; Docket Entry 71-1), photos of Plaintiff's meals (Docket Entry 75-5), Plaintiff's nutritional assessment (Docket Entry 75-6) and HCDC's Meal Planning Policy (Docket Entry 75-7).

### Evidence Submitted by Sheriff Peterkin, Major Revels, & Hoke County

Plaintiff was arrested on or about October 19, 2014 and taken to HCDC. (Lewis Part I Dep. at 18, Docket Entry 67-3.) Plaintiff was first diagnosed with Type 2 diabetes in January 2009 while previously incarcerated at Wake Correctional Center. (*Id.* at 15.) After receiving this diagnosis, Plaintiff was prescribed Glucophage (also known as Metformin), for the remainder of his time during his initial incarceration. (*Id.*) While Plaintiff was out of prison from May 2012 to October 19, 2014, he was receiving medical care at the Raeford Family Care for his diabetes. (*Id.* at 19.) During this time, Plaintiff states that a physician at Raeford Family Care prescribed him Metformin (twice a day), Simvastatin (once a day), Gliclazide (once a day), and Aspirin (once a day). (*Id.* at 20-22.)

Once Plaintiff was brought to HCDC on October 19, 2014, a jail nurse was not present during his admission, but he was given a medical questionnaire to complete. (*Id.* at 18, 47-48.)

7

He complained to jailers about needing to see a nurse but did not complete a sick call request until October 22, 2014. (*Id.* at 48-50.) On the next day, Plaintiff was seen by Nurse Dial with SHP, whom performed a full medical evaluation of Plaintiff, obtained a signed medical release from him, and communicated with Raeford Family Care regarding the Plaintiff's prior medical history. (*Id.* at 50-51, 141, 145.) Within 24 hours of seeing Nurse Dial, Plaintiff received his first dose of Metformin. (*Id.* at 141, 145.) From that point forward, Plaintiff received his Metformin medication (1,000 milligrams twice a day), he saw medical staff daily while at HCDC, and he had his blood sugar checked twice a day. (*Id.* at 59, 61-62, 111, 129, 146.) Plaintiff further acknowledges that SHP medical staff at HCDC responded to his complaints "within their capacity." (*Id.* at 142.)

Although Plaintiff did not receive his other medications previously prescribed at Raeford Family Care (*see id.* at 59-60), biannual inspections by the North Carolina Department of Health and Human Services ("NC DHHS") and annual inspections by the Hoke County Health Department did not reveal any deficiencies concerning the adequacy of the medical care provided at HCDC. (Peterkin Aff. ¶ 11, Docket Entry 67-2; *see also* Exs. A, B to Peterkin Aff., Docket Entry 67-2 at 9-35; Revels Aff. ¶ 4, Docket Entry 67-1.) Moreover, Plaintiff "just [doesn't] know" whether his condition would had been different if the two additional medications were prescribed while he was at HCDC. (Lewis Part II Dep. at 57-58, Docket Entry 67-4.)

Additionally, Plaintiff complained about how his diet at HCDC for approximately 18 months contained food that was bad for his diabetic condition such as processed meats, sugars, and starches. (Lewis Part I Dep. at 85-87, Docket Entry 67-3.) However, during his

time at HCDC Plaintiff consistently purchased processed meats and sweets with his own money from the commissary. (Lewis Part II Dep. at 72-78, Docket Entry 67-4; *see also* Exs. 2, 3, 4 to Lewis Part II Dep., Docket Entry 67-4 at 101-79.)

Plaintiff's food diet did change in April 2016 which almost entirely cut out processed meats, starches, and sugars. (Lewis Part II Dep. at 4, 7-11, Docket Entry 67-4.) Nevertheless, Plaintiff testified that this new diet was the result of a nurse, not a physician, filling out a "generic medical needs form." (Lewis Part I Dep. at 89-91, Docket Entry 67-3.) However, Plaintiff does not know whether a physician was consulted prior to the jail nurse changing his diet. (*Id.* at 137-38.) Plaintiff testified that this modified diet did not provide sufficient calories and often made him constipated or vomit. (*Id.* at 116; Lewis Part II Dep. at 3, 7, 39-40, Docket Entry 67-4.)

All in all, despite Plaintiff's food diet and diabetes, he testified that he never experienced diabetic shock or a reaction during any time at Hoke County. (Lewis Part I Dep. at 64, Docket Entry 67-3.) Although Plaintiff experienced nerve pain in his feet during his time at HCDC (*see id.* 69-71), he concedes that "[a]t some point certain things are going to happen because you're a diabetic and you may not be able to control those things." (*Id.* at 70.) Also, Plaintiff is unable to point to any standard of care that Defendants violated. (Lewis Part II Dep. at 61, Docket Entry 67-4.)

As prison officials in authoritative positions, neither Sheriff Peterkin nor Major Revels had personal contact with Plaintiff, nor were they aware that Plaintiff was experiencing any serious medical condition that was not being addressed appropriately. (Peterkin Aff. ¶¶ 7, 10, Docket Entry 67-2; Revels Aff. ¶¶ 5, 14, Docket Entry 67-1.) They, along with HCDC

detention staff rely upon the professional medical judgment and expertise of SHP and its medical staff regarding the evaluation and medical care of all inmates housed at HCDC, including Plaintiff. (Peterkin Aff. ¶ 8; Revels Aff. ¶¶ 6, 11.) Furthermore, it is the policy of Sheriff Peterkin that the detention staff at HCDC will obey and comply with the orders, directives and recommendations of medical care providers regarding the medical, dental, and mental health care and treatment of all prisoners housed at HCDC. (Peterkin Aff. ¶ 8; Revels Aff. ¶¶ 6, 11.)

Additionally, Major Revels states that Plaintiff's meals were in compliance with North Carolina administrative codes. (Revels Aff. ¶¶ 9-11.) To her knowledge, neither the NC DHHS nor the Health Department has ever found fault with the means and methods by which inmate's meals are transported, covered or served, nor regarding the serving temperature of the meals. (*Id.* ¶ 10.) Moreover, Major Revels states that policy allows for modified diets for inmates to be authorized by appropriate medical personnel. (*Id.* ¶ 11.) Major Revels, however, did not have any authority regarding Plaintiff's medical diet since she does not have the training required to do so. (*Id.*) Similarly, Major Revels relayed Plaintiff's complaints regarding his new medical diet, and Major Revels responded by confirming that Plaintiff's meals were compliant with the minimum caloric requirement. (*Id.* ¶ 12.) When Major Revels received a grievance from Plaintiff in which he complained about food preparation, she immediately relayed these concerns to ABL Food Service's kitchen staff and she received assurances that these concerns would be addressed. (*Id.* ¶ 13.) Neither Sheriff Peterkin nor Major Revels knowingly engaged in any conduct that they knew to be in violation of the Plaintiff's constitutional rights. (Peterkin Aff. ¶ 14; Revels Aff. ¶ 15.)

## Evidence Submitted by SHP

During Plaintiff's incarceration at HCDC, SHP was responsible for providing medical care to Plaintiff through trained medical staff. (*See* Huffman Aff. ¶ 10, Docket Entry 70; Sanders Aff. ¶ 6, Docket Entry 71.) Nurse Lorna Huffman is a licensed registered nurse who was employed by SHP as a nursing regional manager from October 2015 to February 2017. (Huffman Aff. ¶ 3.) She provided some nursing services to HCDC in 2016. (*Id.* ¶¶ 6-7.) Nurse Michelle Sanders was employed by SHP as a licensed practical nurse who worked as needed at HCDC to provide nursing care to inmates. (Sanders Aff. ¶ 3.) The physician assistant, Manuel Maldonado ("P.A. Maldonado"), came to HCDC once weekly to treat patients, review medical records, and enter orders. (*See* Huffman Aff. ¶ 10; Sanders Aff. ¶ 6.) During his period of incarceration, Plaintiff was seen by medical staff on multiple occasions for various medical reasons including treatment for his diabetes. (*See* Ex. 1 to Huffman Aff., Docket Entry 70-1.) SHP medical officials also confirm that Plaintiff was consistently receiving treatment for his diabetes at HCDC by receiving 1,000mg of Metformin twice a day and getting his blood sugar levels checked twice a day. (Huffman Aff. ¶¶ 14-16; Sanders Aff. ¶¶ 10-11.)

Additionally, when Plaintiff complained to Nurse Sanders regarding his need for a diabetes-friendly diet, she completed a medical needs form to ensure that kitchen staff at HCDC was aware of Plaintiff's restricted diet. (Sanders Aff. ¶ 18; Huffman Aff. ¶ 20.) Again, when Plaintiff was worried about his new diabetic diet that consisted of mostly peanut better, bread, and vegetables, medical staff at HCDC reviewed Plaintiff's average blood sugar levels which were noted to be normal. (Sanders Aff. ¶ 20; Huffman Aff. ¶ 22.) They also informed

Plaintiff that medical staff do not have authority to select or control the specific selection of food that is served to the inmates. (Sanders Aff. ¶ 21; Huffman Aff. ¶¶ 23-24.) In July 2016, by request of HCDC detention staff, Nurse Huffman placed 13 photos of Plaintiff's meal trays into his medical record. (Huffman Aff. ¶ 25.) SHP medical staff aver that Plaintiff received medical care in accordance with the accepted standard of practice. (Sanders Aff. ¶ 23; Huffman Aff. ¶ 26.)

### Evidence Submitted by Summit & Kevin Edge

As previously stated, ABL Food Service was contracted to provide food service HCDC and later transferred its account with HCDC to Summit. (*See* Holley Decl. ¶¶ 2-4, Docket Entry 75-2; Anderson Decl. ¶ 3, Docket Entry 75-8.) All food served to the inmates was approved by dietitians. (Holley Decl. ¶ 4.) Food Service Directors were not involved in creating menus, and food service staff for both Summit and ABL Food Service were required to follow the instructions on the menus, including using set recipes for each menu item. (*Id.*) Moreover, three meals were provided to prisoners each day, seven days per week, and menus were rotated on either a two-week or four-week cycle. (Holley Decl. ¶ 5; Barthel Decl. ¶ 5, Docket Entry 75-3; Ex. A to Barthel Decl., Docket Entry 75-3 at 7-147.) If inmates had a certain medical diet assigned by the medical staff, the Food Service Director was required to serve that inmate in accordance with the corresponding medical diet menu that had been approved by the dietitian. (Holley Decl. ¶ 8.) The dietitian uses the Unisoft Systems Associate Program that evaluates proposed menus to ensure that it satisfied recommended daily allowance in compliance with the Food and Nutrition Board of the National Academy of

Sciences, state laws, and any contractual requirements. (Barthel Decl. ¶ 6; *see also* Ex. C to Barthel Decl., Docket Entry 75-3 at 153-57.)

Additionally, the Food Service Directors are responsible for placing food orders, supervising the food service employees, ensuring that employees followed ABL Food Service's sanitary requirements and general food safety, and ensuring that all meals followed the menus provided by ABL. (Edge Decl. ¶¶ 4, 6, Docket Entry 75-4.) Medical staff would provide instructions for any inmate that had specific dietary need and Defendant Edge, one of the Food Service Directors during Plaintiff's incarceration, states that he followed those guidelines. (*Id.* ¶ 9.) While cooking the diabetic meals specifically, the ABL Food Service team would not use sugar when cooking, substitute lower or sugar free-items, and reduce the portion of pastas. (*Id.* ¶ 12.) Peanut butter was an approved protein substitute for starches or processed meat. (*Id.* ¶ 17.) Justin Barthel, a registered dietitian for Summit, reviewed the peanut butter and vegetable diet (that Plaintiff claims he received at HCDC) using the nutrition software and confirmed that the diet described, if fully consumed, satisfies all caloric and nutritional requirements. (Barthel Aff. ¶ 17.)

Although the food service staff prepared the meals, it was HCDC detention staff that controlled the length of time between the kitchen staff prepping/loading the meals onto carts and the meals being served to the inmates. (Edge Decl. ¶ 13.) Defendant Edge also states that HCDC made the decisions regarding the equipment that was provided to store the meals between preparation and serving. (*Id.* ¶ 14.) He further states that all meals served to Plaintiff complied with the medical needs form. (*Id.* ¶ 16.)

13

1. **Defendants Sheriff Peterkin, Major Revels, & Hoke County's Motion for Summary Judgment**

Defendants Sheriff Peterkin and Major Revels argue that summary judgment should be granted in their favor because they are entitled to qualified immunity in their individual capacities. (Docket Entry 67 at 11-17.) Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006) ("Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983[.]"). Thus, the traditional two-step qualified immunity inquiry requires a court to determine: "(1) whether the official violated a constitutional right; and if so (2) whether the right was 'clearly established' at the time of its violation." *Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 546-47 (4th Cir. 2010) (citation omitted). In evaluating qualified immunity, a court initially may determine whether the plaintiff has alleged or shown a violation of a constitutional right at all. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Further, "[b]ecause qualified immunity is designed to shield officers not only from liability but from the burdens of litigation, its establishment at the pleading or summary judgment stage has been specifically encouraged." *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992).

As a pretrial detainee at HCDC during the relevant time period, Plaintiff was "entitled to at least the same protection under the Fourteenth Amendment as are convicted prisoners under the Eighth Amendment." *Young v. City of Mount Ranier*, 238 F.3d 567, 575 (4th Cir.

14

2001). Thus, deliberate indifference to a serious medical need of a pretrial detainee is a violation of the Due Process Clause. *Id.* "Historically, the United States Court of Appeals for the Fourth Circuit has applied the same analysis to Section 1983 deliberate indifference claims under the Fourteenth Amendment as under the Eighth Amendment." *Durand v. Charles*, No. 1:16CV86, 2018 WL 748723, at *11 (M.D.N.C. Feb. 7, 2018), *subsequently aff'd*, 733 F. App'x 116 (4th Cir. 2018).

Considering its similar standard, the Eighth Amendment only proscribes acts or omissions by prison officials that are "sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Since *Estelle*, courts have developed a two-part test for evaluating § 1983 claims alleging Eighth Amendment violations as to medical care: courts first evaluate whether there was evidence of a serious medical need and if so, then consider whether a defendant's response to that need amounted to deliberate indifference. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

In the prison context, a serious medical need exists if (1) a condition has been diagnosed by a physician as mandating treatment or is so obvious that a layperson would recognize the need for medical care; or if (2) a delay in treatment causes a lifelong handicap or permanent loss. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In order to prove deliberate indifference, a plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety." *Id.* Deliberate indifference incorporates a subjective standard, focusing on the defendant's conscious disregard of a substantial risk of harm. *Id.* at 839; *see also Parish v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004). Additionally, the individual defendant must realize his actions were inappropriate as a result of his actual knowledge of risk to the

inmate. *Parish*, 372 F.3d at 303. This standard is more than mere negligence, requiring actual knowledge of the individual defendant's own recklessness. *Farmer*, 511 U.S. at 835-36.

It is also well settled that negligence or medical malpractice are not sufficient to establish deliberate indifference. *Estelle*, 429 U.S. at 105-06. "The bottom line is that prison officials without medical training are responsible for seeing that prisoners are attended to by medical professionals. They are not responsible for determining the course of treatment or for overruling the opinions of those professionals." *Pulliam v. Super. of Hoke Correct.*, 1:05CV1000, 2007 WL 4180743, at *6 (M.D.N.C. Nov. 20, 2007) (unpublished).

Here, the evidence demonstrates that there was no constitutional violation with regard to the medical care provided to Plaintiff during his time at HCDC. First, Plaintiff cannot offer any evidence or authority that his evaluation by a medical official approximately 4 days after admission into HCDC violated any legal or medical standard. Indeed, Plaintiff's own allegations state that SHP policy provides for an evaluation by medical staff within 14 days of booking into a respective detention center. (*See* Compl. at 15, 29.) Thus, if Plaintiff was seen and evaluated by medical staff within four (4) days of his booking into HCDC and received adequate medical treatment throughout the entirety of his incarceration at HCDC, Plaintiff's allegations cannot amount to a deprivation of constitutional rights here.

As for Plaintiffs contention that SHP's medical staff should have prescribed additional medications for him beyond Metformin, neither mistakes in medical judgment, nor disagreements between an inmate and medical personnel regarding proper treatment, nor the fact that treatment is ineffective alone rise to the level of "deliberate indifference." *See Estelle*, 429 U.S. at 107; *Jackson v. Sampson*, 536 F. App'x 356, 357 (4th Cir. 2013); *Russell v. Sheffer,* 528

16

F.2d 318, 319 (4th Cir. 1975). Indeed, even Plaintiff testified that he "just [doesn't] know" whether anything would had been different if the two additional medications were prescribed while he was at HCDC. (Lewis Part II Dep. at 57-58, Docket Entry 67-4.)

In addition, Plaintiff cannot present competent evidence to establish that he has sustained any serious or significant injury, or substantial risk of a serious harm as a result of any acts or omissions that he claims occurred during his detention at HCDC. *See Oldham v. Beck*, 75 F. App'x 122, 125 (4th Cir. 2003) (unpublished). Again, Plaintiff testified that he never experienced diabetic shock or reaction during any time at Hoke County. (Lewis Part I Dep. at 64, Docket Entry 67-3.) Although Plaintiff experienced nerve pain in his feet during his time at HCDC (*see id.* 69-71), he concedes that "[a]t some point certain things are going to happen because you're a diabetic and you may not be able to control those things." (*Id.* at 70.) The evidence simply does not demonstrate that a constitutional violation on the part of Defendants.

Moreover, Plaintiff cannot show any deliberate indifference on the part of Sheriff Peterkin or Major Revels. As prison officials, they were entitled to rely on the medical judgments made by medical personnel regarding Plaintiff's diabetes treatment. *See, e.g., Iko,* 535 F.3d at 242 (holding that once a prisoner is placed into the care of appropriate medical personnel, " 'a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands' " (quoting *Spruill v. Gillis,* 372 F.3d 218, 236 (3d Cir. 2004))). There are some instances in which a prisoner official can act with deliberate indifference if he intentionally denies or delays access to medical care or intentionally interferes with prescribed treatment. *See Latson v. Clarke*, 346 F. Supp. 3d 831, 861 (W.D. Va. 2018), *aff'd*, 794 F. App'x

266 (4th Cir. 2019) (citing *Estelle*, 429 U.S. at 104-05) ("Prison officials who are not medical providers can exhibit deliberate indifference to serious medical needs by intentionally denying access to care or intentionally interfering with prescribed treatment."); *Loe v. Armistead*, 582 F.2d 1291, 1296 (4th Cir. 1978) ("unusual length of the delay provides a reasonable basis for the inference" of deliberate indifference to a serious medical need). Here, however, there is no evidence to suggest that either Sheriff Peterkin or Major Revels intentionally denied or delayed Plaintiff from receiving access to medical care or that either of them intentionally interfered with any prescribed treatment.

Moreover, Plaintiff cannot demonstrate any knowledge on the part of either Sheriff Peterkin or Major Revels that he was experiencing a serious medical condition that was not being properly addressed and that they knew of, and intentionally disregarded, an objectively serious condition, medical need, or risk of harm to Plaintiff. As such, Plaintiff cannot establish deliberate indifference claims against said Defendants.

Likewise, there is no constitutional violations attributed to Sheriff Peterkin and Major Revels regarding the food conditions at HCDC. It is well settled that "inmates must be provided nutritionally adequate food, 'prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.' " *Shrader v. White,* 761 F.2d 975, 986 (4th Cir. 1985) (citations omitted). However, the Constitution "does not guarantee food that is prepared and served in a culinarily pleasing manner." *Tyler v. Lassiter*, No. 5:13-CT-3139-FL, 2016 WL 866325, at *5 (E.D.N.C. Mar. 3, 2016) (unpublished) (citation omitted).

First, as set out above, the evidence demonstrates that there were no documented deficiencies from agencies overseeing food services expressing complaints or concerns regarding the quality of the food, its nutritional contents, or the manner in which the meals were transported.  (Revels Aff. ¶¶ 9-11, Docket Entry 67-1.)  Again, Sheriff Peterkin and Major Revels was entitled to rely upon medical staff and food service dietitians concerning food quantity, quality and nutritional contents served to Plaintiff.  There is no evidence that they were aware of any food concerns and intentionally failed to take any action to correct those concerns.

To the extent Plaintiff complains about the temperature of the food or the occasional presence of foreign objects in the food, these too fail to state a constitutional claim.  Many courts have held that cold food does not rise to the level of a constitutional *violation.  See, e.g.*, *Hewitt v. Ward*, No. CIV.A. 0:12-2373-MGL, 2013 WL 4056293, at *5 (D.S.C. Aug. 12, 2013) (unpublished) ("To the extent that [plaintiff] alleges that he experienced cruel and unusual punishment because . . . of the food's temperature, or because of the lack of variety of his meals, his claims fail as a matter of law."); *Davis v. Villers*, No. 5:12CV48, 2012 WL 7017863, at *7 (N.D.W. Va. Oct. 9, 2012) (unpublished) ("Plaintiff has not alleged his health has been endangered in any way, merely that he is displeased with the temperature of the food."), *report and recommendation adopted*, No. 5:12CV48, 2013 WL 459747 (N.D.W. Va. Feb. 7, 2013) (unpublished); *Laufgas v. Speziale*, 263 F. App'x. 192, 198 (3d Cir. 2008) (finding no constitutional right to hot meals every day); *Lunsford v. Bennett*, 17 F.3d 1574, 1581 (7th Cir. 1994) (holding that allegations of cold, poorly prepared beans were insufficient to state a

19

constitutional claim); *Brown–El v. Delo*, 969 F.2d 644, 648 (8th Cir. 1992) (finding no constitutional violation for serving prisoner cold food).

In addition, Plaintiff has not put forth evidence to support his claims that the food contained bugs in it. Moreover, while reports of occasional insects in the food may be regrettable, it does not rise to a constitutional violation. *Lunsford v. Reynolds*, 376 F. Supp. 526, 528 (W.D. Va. 1974) (" 'The only contention concerning food which is detailed at all, is the inmates' complaint that their food frequently contains insects. Nevertheless, occasional incidents of a foreign object contained in food, while regrettable, does not present a question of constitutional proportion.''); *see also Richardson v. Jones*, No. 1:10-CV-01015, 2011 WL 31533, at *6 (W.D. Ark. Jan. 5, 2011) (unpublished) (isolated incidents of insects in prison food did not state a constitutional violation). In sum, there is no evidence of a violation of Plaintiff's constitutional rights. Nor is there evidence of any person involvement of a constitutional violation on the part of Sheriff Peterkin or Major Revels. Thus, they are entitled to qualified immunity and summary judgment should be granted.

Sheriff Peterkin and Major Revels argue that they should otherwise be entitled to summary judgment. (Docket Entry 67 at 19-20.) Solely being in supervisory roles within HCDC generally does not establish a § 1983 individual capacity claim under the theory of *respondeat superior,* because *respondeat superior* generally is inapplicable to § 1983 suits. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694 (1978). Furthermore, an attempt to assert a *Monell* claim against Sheriff Peterkin and Major Revels in their official capacity also fails. Official capacity claims against said Defendants are actually claims against the office of the Sheriff of Hoke County. *McNeill v. Scott*, No. 1:09CV698, 2015 WL 4946542, at *7 (M.D.N.C. Aug. 19,

2015) (unpublished), *report and recommendation adopted*, No. 1:09CV698, 2015 WL 5599194 (M.D.N.C. Sept. 22, 2015) (unpublished).  To establish an official capacity claim here, Plaintiff must demonstrate "(1) the existence of an official policy or custom [of the Sheriff's Office]; (2) that the policy or custom is fairly attributable to the municipality; and (3) that the policy or custom proximately caused the deprivation of a constitutional right." *Pettiford v. City of Greensboro*, 556 F. Supp. 2d 512, 530 (M.D.N.C. 2008) (citation omitted); *see also Simmons v. Corizon Health, Inc.*, 122 F. Supp. 3d 255, 267 (M.D.N.C. 2015), *on reconsideration in part*, 136 F. Supp. 3d 719 (M.D.N.C. 2015).  Here, Plaintiff cannot demonstrate that any violation of his constitutional rights (none of which exists) was the result of any unconstitutional policy, practice, custom or procedure of the Sheriff of Hoke County.  Thus, Defendants' motion for summary should be granted.

Last, Defendant Hoke County asserts that it is entitled to summary judgment as it is not responsible for any acts or omissions on the part of the Sheriff of Hoke County or any of his employees or representatives.  (Docket Entry 67 at 21-22.)  Hoke County is correct.  The conduct of which Plaintiff complains of occurred at HCDC and involves Sheriff Peterkin, his deputies, and medical/food officials contracted by HCDC.  Plaintiff contends that all of HCDC staff were employees of Hoke County.  (Lewis Part I Dep. at 42-43, Docket Entry 67-3.)  However, "[i]n North Carolina, the Office of Sheriff is a legal entity, established by the state constitution and state statutes, separate and distinct from the county because a sheriff is elected by the people, not employed by the county."  *Hines v. Johnson*, No. 1:19CV515, 2020 WL 1516397, at *4 (M.D.N.C. Mar. 30, 2020) (unpublished).  Indeed, "the sheriff has the sole statutory responsibility for the care and custody of the inmates at the county jail." *Vaught v.*

*Ingram*, 2011 WL 761482 at *4 (E.D.N.C. Feb. 24, 2011) (unpublished) (citing N.C. Gen. Stat. § 162-22). "This authority may not be delegated to another person or entity." *Id.* (citing N.C. Gen. Stat. § 162-24). Therefore, Plaintiff's claims against Hoke County fail. *Hines*, 2020 WL 1516397, at *4; *see also Bowman v. Reid*, No. 5:14CV179-RLV, 2015 WL 4508648, at *3 (W.D.N.C. July 24, 2015) (unpublished) (collecting cases) ("The harms that Plaintiffs allege were done to them were done exclusively by the Sheriff and his deputies, not by [defendant] County."), *aff'd sub nom. Gosnell v. Catawba Cty.*, 646 F. App'x 318 (4th Cir. 2016); *Stephney, Jr. v. Columbus Cty.*, No. 5:05-CT-606-FL, 2006 WL 4664318, at *1 (E.D.N.C. Aug. 22, 2006) (unpublished) (county defendant not a proper party to § 1983 action alleging inmate assault at county detention center), *aff'd sub nom.*, *Stephney v. Columbus Cty.*, 210 F. App'x 289 (4th Cir. 2006); *Woodside v. Iredell Cty.*, No. 5:04 CV 95 V, 2006 WL 1582391, at *2 (W.D.N.C. June 2, 2006) (unpublished) ("North Carolina law appears to preclude county liability for most actions of sheriff's department personnel. In other words, North Carolina law draws a distinction between a sheriff and the county in which he works, and the respective liability of each for the alleged misconduct of individual deputies or jailers.").

### 2. **Defendant SHP**

SHP also moves for summary judgment. (Docket Entry 69.) First, SHP contends that Plaintiff's claims related to his initial medical evaluation following booking into HCDC cannot survive summary judgment. (Docket Entry 72 at 5-8.) Because SHP is a contracted medical provider for HCDC, the deliberate indifference standard is applicable to the conduct of SHP and its employees. *West v. Atkins*, 487 U.S. 42, 55 (1998) (explaining that a private entity which contracts with the state to provide medical services acts "under color of state law"). However,

"a private corporation is liable under § 1983 *only* when an official policy or custom of the corporation causes the alleged deprivation of federal rights." *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999).

Here, Plaintiff presents no evidence of such policy or custom beyond his own conclusory and speculative assertions. He alleges that a policy of SHP provides that inmates are to be seen and evaluated by medical staff within fourteen days of booking into a detention center, and such policy caused him to be deprived of his constitutional rights. (*See* Compl. at 15, 29.) However, the existence of such policy does not amount to a deprivation of constitutional rights here. Indeed, Plaintiff was seen by SHP medical officials within four days of booking, his medications were immediately verified and an order was entered for Plaintiff to receive treatment for his diabetes by Metformin, and thereafter Plaintiff received adequate daily medical treatment for his diabetes throughout the entirety of his incarceration at HCDC. (Huffman Aff. ¶¶ 11-16, Docket Entry 70; Sanders Aff. ¶¶ 7-12, Docket Entry 71; Ex. 1 to Huffman Aff., Docket Entry 70-1.) Although Plaintiff takes issue with not receiving his additional medications, Plaintiff "does not have a claim against [SHP] merely because he disagrees with the course of treatment he received." *Henderson v. S. Health Partners*, No. 0:14-CV-01146-JMC, 2015 WL 2218961, at *3 (D.S.C. May 11, 2015) (unpublished); *see also Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010) ("[A] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation.") (internal quotation marks and citation omitted).

Furthermore, Plaintiff is unable to demonstrate a serious or significant injury as a result of the wait time between his initial booking and his initial medical evaluation. Plaintiff alleges

that he exhibited various symptoms, including frequent urination, dehydration, dizziness, rapid breathing, and headaches. (*See* Compl. at 16.) However, Plaintiff's medical records do not reflect that he suffered any of these symptoms or alleged injuries, nor did he go into diabetic shock at any time during his incarceration at HCDC. (*See* Ex. 1 to Huffman Aff.; Lewis Part I Dep. at 64, Docket Entry 67-3.)[5] In sum, Plaintiff's claims against SHP related to his initial medical evaluation cannot survive summary judgment.

Plaintiff's remaining claims against SHP also fail. Plaintiff alleges specifically that SHP knew that he was not being fed a healthy diet for his diabetic condition, allowed a non-physician to change his medical diet, and did not perform routine A1-C testing. (*See* Compl. at 26-27, 28.) However, there is no evidence of a policy or custom of SHP that caused these alleged deprivations of his constitutional rights concerning his medical diet and A1-C testing. To the contrary, Plaintiff acknowledges that SHP medical staff at HCDC responded to his dietary complaints "within their capacity." (Lewis Part I Dep. at 142, Docket Entry 67-3.) This would include Nurse Sanders completing a medical needs form to ensure that kitchen staff at HCDC was aware of Plaintiff's restricted diet. (Sanders Aff. ¶ 18, Docket Entry 71.) Again, it was not within the medical staff authority to control specific food selections for inmates at HCDC. (*Id.* ¶ 21.) Ultimately, because the evidence fails to demonstrate a constitutional violation on the part of SHP, summary judgment should be granted in its favor.

---

[5] Approximately eight months after his initial booking, Plaintiff was seen by medical officials for eye issues and did visit an eye doctor. (*See* Huffman Aff. ¶¶ 18-19, Docket Entry 70.)

### 3. **Defendants Kevin Edge & Summit/ABL Food Service**

Defendants Edge and Summit also move for summary judgment as to all claims against them. (Docket Entries 74, 76.)[6] Similar to SHP, Plaintiff must also identify a policy or custom of Summit and/or ABL Food Service that cause his alleged injuries. The evidence here is completely devoid of such policy or custom. Instead, the evidence shows that ABL Food Service required its food service directors to follow the instructions of medical staff and to provide inmates with medical diets as directed, following medical diet menus approved by ABL Food Service's dietitians. (Holley Decl. ¶¶ 7-8, Docket Entry 75-2; Barthel Decl. ¶ 8, Docket Entry 75-3.) That Plaintiff personally disagreed with his own diabetic diet set forth by certified dietitians is insufficient to establish a widespread and pervasive custom of denying medical diets to inmates. Indeed, Plaintiff's own canteen food purchases of processed meats and sweets and while at HCDC "would appear to pose the same nutritional risks he claims Defendants exposed him to." *White v. Baca*, No. 315CV00573MMDWGC, 2018 WL 5085811, at *7 (D. Nev. Aug. 21, 2018) (unpublished), *report and recommendation adopted*, No. 315CV00573MMDWGC, 2018 WL 4283059 (D. Nev. Sept. 6, 2018) (unpublished).

Moreover, Plaintiff cannot demonstrate that his medical diet posed an objective risk of serious harm. Absent a demonstration of a meal posing a substantial risk of harm, many courts have rejected arguments from diabetic inmates who believe that they have a constitutional

---

[6] Defendant Summit argues that dismissal is appropriate as Plaintiff has failed to exhaust his administrative remedies and Plaintiff has failed to properly serve it. (*See* Docket Entry 75 at 12-13, 25.) Defendant Edge also asserts that Plaintiff failed to properly serve him. (Docket Entry 77 at 15.) Though both arguments are meritorious, the Court will recommend dismissal on alternative grounds discussed herein.

right to diets that are devoid of starches or processed meats.[7] *See e.g.*, *Lowery v. Walker*, No. 4:18-CV-04108, 2019 WL 5386509, at *11-12 (W.D. Ark. Sept. 30, 2019) (unpublished) (rejecting diabetic plaintiff's deliberate indifference claim that he should not be served white bread or processed meats because he could not demonstrate "that the meals he was served were inadequate to maintain his health"), *report and recommendation adopted*, No. 4:18-CV-4108, 2019 WL 5309119 (W.D. Ark. Oct. 21, 2019) (unpublished); *White*, 2018 WL 5085811, at *4-8 (granting summary judgment on diabetic plaintiff's deliberate indifference claim that his meals were too high in starch, sugar, and carbohydrates); *Jeffers v. City of New York*, No. 14CV6173CBAST, 2018 WL 904230, at *31 (E.D.N.Y. Feb. 13, 2018) (unpublished) (holding that diabetic inmates' meals consisting of "smaller main entrées with limited starches" did not establish a constitutional violation); *Blackburn v. South Carolina*, No. C A 006-2011-PMD-BM, 2009 WL 632542, at *15 (D.S.C. Mar. 10, 2009) (granting summary judgment on diabetic plaintiff's deliberate indifference claim that his meals "contains salty food and processed meat"), *aff'd*, 404 F. App'x 810 (4th Cir. 2010).

Additionally, Plaintiff cannot demonstrate that the food service staff were aware of and disregarded a risk of serious harm. Plaintiff has presented no evidence indicating that, prior to April 2016, ABL Food Service was aware that starches and processed meats posed a risk of harm to Plaintiff's medical condition. Plaintiff's needs were not ignored, but rather he was fed a diabetic diet approved by certified dieticians. This simply does not support his contention that his meals were inadequate. Beginning in 2016, when medical staff submitted the medical needs form to the kitchen staff, processed foods, meats and starches were

---

[7] For these same reasons, Plaintiff's claims regarding inadequate nutrition also fail.

26

removed from Plaintiff's diet, but peanut butter sandwiches were served as an approved substitute. After receiving this form, ABL Food Service modified Plaintiff's diet as indicated.

Nor is there evidence that Plaintiff suffered significant injury as a result of his food diet while at HCDC. There is no evidence that points specifically to Plaintiff's food diet as the cause of his alleged high blood sugar, edema, and nerve pain. While Plaintiff complains that his diet lacked adequate nutrition and calories and caused health problems, the evidence above shows that he continued to pose nutritional risks to his own health with canteen purchases of items high in sugar and carbohydrates. Again, this evidence presents no constitutional violations.

To the extent Plaintiff claims that ABL Food Service engaged in deliberate indifference for relying on the medical needs form from medical staff, this argument fails. Prison food service providers can "lawfully rely on the . . . medical staff to make professional judgments" regarding an inmate's dietary accommodations. *Obataiye-Allah v. Clarke*, No. 7:15CV00250, 2016 WL 4197607, at *3 (W.D. Va. Aug. 8, 2016) (unpublished). Thus, the kitchen staff's reliance on the form was proper. Moreover, even if Nurse Sanders lacked authority to submit the medical needs form, Plaintiff has not identified a serious risk of harm posed by the kitchen staff as a result of them following the directive. Nor does the evidence demonstrate that ABL Food Service was aware of any serious risk of harm regarding the medical needs form, and deliberately disregarded it.

Plaintiff's allegations against ABL Food Service regarding the alleged cold and unsanitary food conditions also fail. As articulated above, these allegations do not rise to a level of a constitutional violation.

27

As to Defendant Edge, Plaintiff's claims fail for similar reasons. Plaintiff is unable to show a constitutional violation regarding the alleged conduct of changing Plaintiff's diet pursuant to the medical needs form then serving Plaintiff an inadequate diet. Nor can he show that Defendant Edge caused an injury as a result of his conduct. To the contrary, the evidence above demonstrates that as a food service director, Defendant Edge was not a physician, he did not control the diagnosis or treatment of Plaintiff's medical condition, nor did he determine the specific meals that Plaintiff was served. He appropriately relied on certified dietitians and medical staff. Simply put, there is no constitutional violation and Plaintiff's claims thus fail.[8]

## III. CONCLUSION

For the reasons stated herein, **IT IS HEREBY RECOMMENDED that** Defendants Hoke County, Sheriff Hubert Peterkin, Nachia Revels, Southern Health Partners, and Summit Food Services, LLC/ABL Management, Inc.'s, Motions for Summary Judgment (Docket Entries 66, 69, 74) be **GRANTED,** and this action be dismissed against said Defendants.

**IT IS FURTHER RECOMMENDED** that Defendant Kevin Edge's Motion for Summary Judgment (Docket Entries 76) be **GRANTED** in part with respect to Plaintiff's Fourteenth Amendment claims.

---

[8] To the extent Plaintiff asserts state law negligence claims against Defendant Edge or any other Defendant, the Court should decline to exercise jurisdiction of such claims. *See Ratcliff v. Baltimore Cty. Police Dep't*, No. CV GLR-18-1650, 2019 WL 3588317, at *9 (D. Md. Aug. 6, 2019) (unpublished) ("because the Court will dismiss all of [plaintiff's] § 1983 claims—the claims over which it has original jurisdiction—the Court declines to exercise supplemental jurisdiction over his state law claims."); *Mccants v. Berringer*, No. 1:17CV935, 2020 WL 4586786, at *3 n.4 (M.D.N.C. Aug. 10, 2020) (unpublished) (declining jurisdiction of state law negligence claim).

**IT IS FURTHER RECOMMENDED** that, to the extent alleged, Plaintiff's state-law negligence claim against Defendant Edge be dismissed without prejudice pursuant to the Court's exercise of its discretion under 28 U.S.C. § 1367(c)(3).

Joe L. Webster
United States Magistrate Judge

September 1, 2020
Durham, North Carolina